# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

WILBERTO NEMROD SALAZAR, et al.,

    Defendants.

Case No. 2:17-cr-179
CHIEF JUDGE EDMUND A. SARGUS, JR.

## OPINION AND ORDER

Defendants Wilberto Nemrod Salazar and Rafael Alejandro Somarriba were travelling east on Interstate 70 when they were pulled over at a rest stop by a state trooper. Following a canine drug sniff and search, a large amount of heroin was found in Defendants' rental vehicle. Defendants have now moved to suppress any evidence obtained through that search. For the following reasons, Defendants' motions (ECF Nos. 30, 31, 48) are **DENIED**.

### I.

**A.  Factual Background**

On July 28, 2017, Timothy Williamson, a trooper with the Ohio State Highway Patrol (now a sergeant), was parked facing eastbound traffic in a crossover on Interstate 70. (Hr'g Tr. at 3, 8, ECF No. 44; Investigation Report at 1, ECF No. 30-1.) Detective Marlo Morehouse of the Lancaster Police Department was accompanying Williamson that day as a trainee. (Hr'g Tr. at 8–9, 193–94.) Williamson received a call from a colleague, Sergeant Coverstone, advising Williamson that it "would be worth taking a look at" an eastbound, black Chevy Malibu with an Arizona license plate driven by a male wearing sunglasses. (*Id.* at 9–10.) Coverstone was relaying information that he had received from an Indiana interdiction officer. (*Id.*)

Approximately fifteen minutes after speaking with Coverstone, Williamson observed a black Malibu traveling in the eastbound right lane at a relatively slow speed. (Hr'g Tr. at 10–11, 51.) Williamson observed that the Malibu's driver, later identified as Defendant Salazar, was leaned back in his seat such that the B pillar separating the front and rear doors almost completely obstructed him from view. (*Id.* at 11.) As the Malibu passed in front of Williamson's cruiser, Williamson saw Salazar lean toward the passenger side of the vehicle and lift his left arm up in an apparent effort to shield his face from view. (*Id.* at 11–12.)

After waiting for traffic to clear, Williamson exited the crossover and entered the eastbound right lane to follow the Malibu. (Hr'g Tr. at 12.) Not long after Williamson entered the right lane, the Malibu approached an exit ramp to a rest area. (*Id.*) According to Williamson, the Malibu entered the ramp "at the last minute" and, in the process, drove over the solid lines demarcating the gore.[1] (*Id.* at 12–13.) Morehouse also saw the Malibu drive across the solid lines. (*Id.* at 198–99.)

Williamson continued following the Malibu as it entered the rest area. (Hr'g Tr. at 13–14.) The road leading to the rest area diverges into two routes after the ramp. A sign indicates that cars should keep right and that commercial trucks, cars with trailers, and larger vehicles should keep left. (*Id.* at 14.) Each route leads to a parking lot for the respective types of vehicles. (*Id.*) The Malibu drove left and parked in the lot reserved for commercial trucks and large vehicles. (*Id.* at 14–15.) Salazar quickly exited the vehicle and walked toward the rest area building. (*Id.* at 15.)

While waiting for Salazar to return, Williamson noticed that several other cars were parked in the truck and large vehicle lot. (Hr'g Tr. at 15.) Williamson advised the occupants of

---

[1] The gore is the triangular area between the highway and an exit ramp marked by a V-shaped set of lines—one line continues along the side of the highway and the other line extends down the ramp. (*See* Hr'g Tr. at 12–13.)

2

those vehicles that they were improperly parked and would need to move their cars. (*See id.* at 15–16; Investigation Report at 1.) After directing the other cars to move from the lot, and while still waiting for Salazar to return, Williamson parked his cruiser behind the Malibu, approached the vehicle, and knocked on the window to wake a passenger sleeping in the backseat. (Hr'g Tr. at 17.)

The passenger, later identified as Defendant Somarriba, awoke and exited the Malibu, setting off the car alarm in the process. (Hr'g Tr. at 18.) Somarriba stated that he could not turn off the alarm because he did not have the car keys. (*Id.*) Moments later, Salazar came around the corner of the rest area building and saw Williamson speaking with Somarriba. (*Id.* at 19.) As reported by Williamson, Salazar "immediately stopped in his tracks almost with a deer-in-the-headlight look"; Salazar then "rubbed the top of his head and kind of turned away almost to go back around the building." (*Id.*) Salazar deactivated the car alarm using the key fob in his hand, and after Williamson waved to him, Salazar walked back to the Malibu. (*Id.* at 19–20.)

As Salazar was walking back, Williamson asked Somarriba for identification, which Somarriba "nervously searched for within the vehicle." (Investigation Report at 2.) Williamson then asked Somarriba where he and Salazar were traveling. (Hr'g Tr. at 20.) Somarriba stated that they were going to New York. (*Id.*)

When Salazar reached the Malibu, Williamson observed that he appeared to be nervous and uneasy. (Hr'g Tr. at 20–21.) Salazar was trembling and breathing deeply; his hands were shaking, and his heartbeat was visible through his shirt, Williamson noted. (*Id.* at 24.) And when Salazar shook Williamson's hand, the handshake was, according to Williamson, "very weak" and almost "standoffish." (*Id.* at 20.)

3

Williamson informed Salazar that he was improperly parked in the truck and large vehicle area. (Investigation Report at 2.) Salazar apologized and stated that he had to use the restroom urgently. (*Id.*) Williamson then asked Salazar where he and Somarriba were traveling. (*Id.*) Salazar stated that they were going to Virginia to see a client and that they might also visit New York to do some sightseeing. (*Id.*) When Williamson asked where in Virginia they were going, Salazar initially stated that he did not know but then quickly indicated that they were going to Chantilly. (Hr'g Tr. at 23.) Williamson asked about Salazar's relationship with Somarriba. (*Id.* at 25.) Salazar responded that Somarriba was his assistant and employee. (*Id.*) Williamson also asked Salazar for Somarriba's name. (*Id.* at 26.) Salazar struggled with the question but eventually stated that his assistant's name was Alex. (*See id.* at 26, 81–82.)

Williamson noted that Salazar's nervousness persisted throughout their interactions— even after Williamson had explained to Salazar that he would likely receive only a warning. (Hr'g Tr. at 24.) And throughout their interactions, Williamson noted that there were times when Salazar would look away from him or not maintain eye contact. (*Id.* at 83.)

After speaking with Salazar, Williamson returned to Somarriba. (Hr'g Tr. at 27.) Williamson asked Somarriba for clarification regarding his and Salazar's travel plans. (*Id.* at 27– 28.) Somarriba explained that they were going to Virginia and that they might stop by New York. (*Id.* at 28.) Williamson also asked for clarification about Somarriba's relationship with Salazar. (*Id.* at 29.) Somarriba initially stated that Salazar was a friend; he then said that Salazar was his boss. (*Id.*)

Williamson later learned that the Malibu that Salazar was driving had been rented for him by his niece. (Hr'g Tr. at 36.) The Malibu had an Arizona license plate and had been rented from a different city than the one Salazar was traveling from. (*Id.* at 134; Investigation Report at 2.)

4

Williamson eventually obtained driver's licenses from Salazar and Somarriba. (Hr'g Tr. at 31.) The licenses were issued by California and Arizona, respectively. (*Id.*)

Before Williamson had an opportunity to run any checks on the licenses, Trooper Michael Wilson arrived with his drug detection dog, Pluto. (*See* Hr'g Tr. at 31–32, 34, 134.) Earlier, Williamson had called over the radio for Wilson's assistance. (*Id.* at 133.) Wilson assessed the scene and then informed Williamson that he was going to conduct a canine sweep of the Malibu. (*Id.* at 134.)

Wilson conducted the sweep by leading Pluto counter-clockwise around the car and instructing Pluto with hand presentations to sniff the car's seams. (Hr'g Tr. at 135–36.) As Wilson walked past the passenger-side B pillar (i.e., the panel between the front and rear doors), Pluto snapped his head back toward the B pillar. (*Id.* at 136–37.) Pluto stopped, bracketed (i.e., smelled an area by moving his head back and forth), and positioned his body perpendicular to the car. (*Id.* at 137–38.) Pluto then scratched at the car, a signal he is trained to give when he detects the presence of narcotic odor. (*Id.* at 138.) As Wilson pulled Pluto away from the car, Pluto continued to alert to the presence of narcotic odor along the right side of the vehicle. (*Id.* at 143.)

Following Pluto's positive alert, Williamson and Wilson searched the Malibu. (Hr'g Tr. at 143; Investigation Report at 2.) They found a large amount of heroin hidden in various bags and suitcases. (*See* Investigation Report at 2–3.)

**B.    Procedural Background**

On August 10, 2017, Defendants Salazar and Somarriba were indicted for possession with intent to distribute heroin. (Indictment at 1, ECF No. 10.) Defendants subsequently filed the present motions for suppression in which they contend that the evidence against them was collected in violation of the Fourth Amendment.

The Court held an evidentiary hearing on the suppression motions. (Mins. at 1, ECF No. 42.) Williamson, Wilson, Morehouse, and Matthew Sauer testified. (*Id.* at 1–3.) Williamson, Wilson, and Morehouse described the events surrounding the stop and search of Defendant's rental car. (*See* Hr'g Tr. at 3–200, ECF No. 44.) Sauer, a private investigator hired by Defendants, testified that he drove east on Interstate 70 and videotaped his trip as he traveled the route taken by Defendants and Williamson. (*Id.* at 203–04.) Sauer drove in the far right lane at a relatively slow speed and took the exit ramp leading to the rest area where the stop and search took place. (*Id.* at 204.) Sauer testified that it was a half a mile from the crossover where Williamson would have been parked to the rest area exit ramp. (*Id.* at 205.) And he explained that the lines forming the gore at the rest area exit ramp were not visible until he was almost directly on top of them. (*Id.* at 206.)

Based on the evidence adduced at the hearing, Salazar submitted a supplemental brief (ECF No. 48) in support of his motion to suppress. The Government declined to file a response.

## II.

### A. Probable Cause to Stop Defendants

Defendants contend that Williamson did not have probable cause to stop them. (Mot. at 5–6, ECF No. 30.) The Court disagrees.

"Stopping a vehicle and detaining its occupants amounts to a seizure under the Fourth Amendment." *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000). To determine whether a stop is constitutionally reasonable, a court must determine (1) "whether the officer's action was justified at its inception" and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quoting *Terry v. Ohio*, 392

U.S. 1, 20 (1968)). The Government bears the burden of proving the legality of a traffic stop. *United States v. Wells*, 690 F. App'x 338, 342 (6th Cir. 2017).

A traffic stop is justified at its inception "when a police officer has reasonable suspicion of an ongoing crime or a completed felony or when he has probable cause to believe that a civil traffic violation has been committed." *Hoover v. Walsh*, 682 F.3d 481, 493 (6th Cir. 2012). Reasonable suspicion is "more than an ill-defined hunch"; it is "a particularized and objective basis for suspecting [a] particular person . . . of criminal activity." *Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir. 2003) (quoting *Houston v. Clark Cty. Sheriff Deputy John Does 1–5*, 174 F.3d 809, 813 (6th Cir. 1999)). The probable cause standard is more demanding. *United States v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016). An officer has probable cause when he has a "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). To determine whether an officer had reasonable suspicion or probable cause to make a stop, the court must examine the totality of the circumstances. *Collazo*, 818 F.3d at 257; *United States v. Padro*, 52 F.3d 120, 123 (6th Cir. 1995). An officer's subjective motivation for stopping a vehicle is, however, irrelevant to the court's Fourth Amendment analysis. *See Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Westmoreland*, 224 F. App'x 470, 474 (6th Cir. 2007).

1. **Witness Credibility**

Defendants ask the Court to disbelieve Williamson's and Morehouse's testimony that they observed Defendants' rental car cross the gore lines as the car entered the rest area exit ramp. (*See* Suppl. Mot. at 1–9, ECF No. 48.) Defendants offer three arguments for the why the Court should reject the testimony.

First, Defendants contend that their private investigator's testimony and video conclusively establish that Williamson, who testified to being approximately a quarter mile behind Defendants, could not have seen Defendants' car cross the gore lines. (Suppl. Mot. at 2.)

The Court disagrees with this assessment of the evidence. Sauer testified that he was not able to see the gore lines until he was "starting to get off the – to the ramp to the rest area." (Hr'g Tr. at 206, ECF No. 44.) Sauer, however, did not give a measurement in feet or fractions of a mile as to when he was first able to view the gore lines. (*See id.*) And Sauer, in fact, acknowledged that his testimony and video did not preclude the possibility that Williamson and Morehouse observed the Malibu cross the gore lines. (*See id.* at 207–08 ("Q. And you're not sitting here testifying today that it's not possible that they observed a lane violation, are you? A. Well, I can't say. I wasn't there so I don't know what they saw.) ("Q. So they could have very well saw a lane violation of somebody exiting over that gore line into that rest area. A. Could have. Could not have. I can't say.").

Second, Defendants contend that Williamson's failure to turn on the cruiser camera after purportedly witnessing the Malibu cross the gore lines was intentional. (Suppl. Mot. at 3.) The cruiser's camera is constantly recording, but the recording is only saved when the camera is activated. (Hr'g Tr. at 67.) The camera is activated when the trooper (a) turns on the cruiser's lights or sirens or (b) activates the camera manually. (*Id.* at 67–68.) When the camera is activated, the 60 to 90 seconds of footage preceding the activation is also saved. (*Id.* at 67.) Williamson's failure to turn on the camera demonstrates that he did not see the supposed traffic violation, Defendants argue. (Suppl. Mot. at 3.)

There are, however, a variety of reasons other than the nefarious one suggested by Defendants that could explain why Williamson did not turn on his cruiser camera. Most

8

obviously, Williamson may have simply forgotten or been too distracted to turn it on. Given that Defendants have not produced any evidence showing that Williamson intentionally failed to turn on the cruiser camera, the Court rejects the assertion.

And third, Defendants point to several purported inconsistencies in Williamson's testimony and investigation report. (Suppl. Mot. at 3–6.) Because Williamson purportedly testified dishonestly about those issues, Defendants ask the Court to assume that Williamson lied about seeing Defendants' rental car cross the gore lines. (*Id.* at 4.)

Defendants contend that Williamson testified dishonestly when he stated that he called for Wilson's assistance only after questioning Salazar. (Suppl. Mot. at 4.) Williamson's dash camera video shows that Williamson and Salazar finished their initial conversation at around 11:24:27 a.m. (Dash Camera Video at 11:21:14 a.m. to 11:24:27 a.m.) Williamson then ushered Salazar to the cruiser and patted him down for weapons. (*Id.* at 11:24:27 a.m. to 11:25:21 a.m.) Williamson is not visible in the video as the pat-down occurs. (*Id.*) Radio chatter about the traffic stop is audible in the background. (*Id.*) Several minutes later, at 11:28:53 a.m., Wilson and Pluto walk into view and approach Defendants' rental car. (*Id.* at 11:28:53 a.m.)

Williamson's Unit History Report indicates that he made a query request for the Malibu's license plate at 11:14:08 a.m. (Hr'g Tr. at 42.) The Report then indicates that Williamson initiated a traffic stop at 11:25:06 a.m. (*Id.* at 43.) Wilson's Unit History Report indicates that he was dispatched to the rest stop at 11:29:06 a.m. (*Id.* at 151.) Both troopers testified that Williamson called for Wilson's assistance around that time. (*Id.* at 48, 152–53.)

Nothing in this record convinces the Court that Williamson lied about the timing of his call to Wilson. For one, minor discrepancies are to be expected in witness testimony about events that occurred months earlier. Unit History Reports, moreover, are not precise records of when

9

events occur in the field. As Williamson and Wilson explained during the suppression hearing, information contained in the Unit History Reports is generally entered by someone at the dispatch center after a trooper relays the information from the field. (*See* Hr'g Tr. at 44–45, 152.) If the dispatcher is busy, the information might not be recorded immediately. (*See id.* at 152.) The dash camera video is not dispositive either. There is no clear point in the video where Williamson can be seen or heard calling Wilson. But there is a period when Williamson is not visible and radio chatter about the traffic stop is audible the background. (Dash Camera Video at 11:24:29 a.m. to 11:25:21 a.m.) The Court cannot discern whether Williamson's call to Wilson is part of this chatter. Williamson insists, though, that he called for Wilson's assistance after speaking with Salazar, (Hr'g Tr. at 88–90), and the Court finds Williamson credible.

Defendants next argue that Williamson testified dishonestly when he stated that Salazar's hands were shaking, that Salazar's heartbeat was visible through his shirt, and that Salazar would not make eye contact with him. (Suppl. Mot. at 5.) Williamson must have been lying, Defendants assert, because these purported behaviors are not discernible in the dash camera video. (*See id.*) Williamson's dash camera video does not show shaking in Salazar's hands, a heartbeat visible through Salazar's shirt, or a lack of eye contact between Salazar and Williamson. (*See* Dash Camera Video at 11:21:14 a.m. to 11:25:42 a.m.) But the inability to perceive such subtle physiological responses in the video does not prove that Williamson lied. The video's resolution is relatively low. (*See id.*; Hr'g Tr. at 110–11.) And Salazar was standing much closer to Williamson than he was to the camera when Williamson was questioning him, giving Williamson a better vantage point to view Salazar's physiological responses. (*See* Hr'g Tr. at 111.)

Williamson again testified dishonestly, Defendants aver, when he stated that Salazar could not remember Somarriba's name. (Suppl. Mot. at 5.) When Williamson asked Salazar if he knew Somarriba's name, Salazar struggled to give an answer and then, nearly two minutes later, provided Somarriba's nickname—Alex. (Dash Camera Video at 11:23:42 a.m. to 11:25:37 a.m.) Salazar never provided Somarriba's full name—Rafael Alejandro Somarriba (*See id.* at 11:30:45 a.m. to 11:31:09 a.m.) True, Williamson's testimony would have been more accurate if he had stated that Salazar only provided Somarriba's nickname. But given that Salazar did fail to provide Somarriba's name, Williamson's testimony was not untrue—or dishonest.

Lastly, Defendants contend that Williamson testified dishonestly when he stated that Salazar and Somarriba provided contradictory travel plans. (Suppl. Mot. at 6.) The Court finds no merit to this argument. When Williamson first asked Somarriba where they were traveling, Somarriba stated that they were traveling to New York. (Investigation Report at 2, ECF No. 30-1.) Salazar, by contrast, stated that they were traveling to Virginia to see a client and that they might also visit New York to do some sightseeing. (*Id.*) Because Defendants offered inconsistent answers when asked where they were going, Williamson was accurate in reporting that their plans were contradictory.

In sum, none of the purported inconsistencies identified by Defendants convinces the Court that Williamson lied about seeing Defendants' rental car cross the gore lines.

### 2. Violation of Ohio Law

Defendants also argue that even if the Malibu crossed the gore lines, that action did not violate Ohio law because Williamson did not testify that Salazar's exit from the highway was done "without safety." (Suppl. Mot. at 3, ECF No. 48.)

11

Under Ohio law, "[w]henever any roadway has been divided into two or more clearly marked lanes for traffic . . . [a] vehicle or trackless trolley shall be driven, as nearly as practicable, entire within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety." O.R.C. § 4511.33(A).

Defendants cite a decision from an Ohio appellate court for the proposition that the Government, to establish a violation of O.R.C. § 4511.33(A), must present evidence "that the driver of a vehicle moving either between lanes of traffic or completely out of a lane of traffic failed to ascertain the safety of such movement prior to making the movement." *State v. Ross*, 2013-Ohio-1488, 990 N.E.2d 1127, ¶ 11 (9th Dist.) (quoting *State v. Barner*, 9th Dist. Medina No. 04CA0004-M, 2004-Ohio-5950, ¶ 14).

Defendants' reliance on *Ross* is unavailing. In *Ross*, the court of appeals considered a defendant's appeal of his conviction for a marked-lanes violation. *Ross*, 2013-Ohio-1488, ¶ 18. Here, by contrast, the Court is determining whether a trooper had probable cause to believe that Salazar committed a marked-lanes violation.

The Ohio Supreme Court, moreover, has rejected an argument nearly identical to the one raised by Defendants. In *State v. Mays*, 119 Ohio St. 3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶¶ 2–3, the defendant was pulled over and later charged with drunk driving and a marked-lanes violation under O.R.C. § 4511.33 after a state trooper observed the defendant's car drive across the white edge line twice. The Ohio Supreme Court concluded that the trooper had reasonable suspicion to pull over the defendant based on this observation. *Id.* ¶¶ 16, 21. Rejecting the defendant's argument "that the stop was unjustified because there was no reason to suspect that [the defendant] had failed to first ascertain that leaving the lane could be done safely or that he

had not stayed within his lane 'as nearly as [was] practicable,'" the court explained: "the question of whether [a defendant] might have a possible defense to a charge of violating R.C. 4511.33 is irrelevant in our analysis of whether an officer has a reasonable and articulable suspicion to initiate a traffic stop. An officer is not required to determine whether someone who has been observed committing a crime might have a legal defense to the charge." *Id.* ¶ 17.

Here, Williamson observed Defendants' rental car cut, "at the last minute," across the solid lines demarcating the gore. (Hr'g Tr. at 12, ECF No. 44.) This observation gave Williamson probable cause to believe that Salazar exited the highway without first ascertaining that the movement could be made with safety and that Salazar therefore violated § 4511.33(A).

Because the Government has shown that Williamson had probable cause to stop Defendants under § 4511.33(A), the Court need not address Defendants' assertion that their undisputed parking violation (i.e., parking in the truck area) should not create probable cause for the stop. (*See* Suppl. Mot. at 8–9.)

**B.     Reasonable Suspicion to Prolong the Traffic Stop**

Defendants next aver that Williamson unlawfully prolonged the traffic stop so that Wilson could conduct a canine drug sniff. (*See* Mot. at 7–8, ECF No. 30.) This argument is unavailing.

"Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (citations omitted) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop,'" such as checking the driver's license, determining whether there are outstanding

13

warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Id.* at 1615 (*Caballes*, 543 U.S. at 408). If an officer prolongs a traffic stop beyond the time reasonably required to complete this mission, the stop typically becomes unlawful. *Id.* An officer may only prolong a traffic stop if he develops reasonable suspicion of criminal activity during the stop. *United States v. Winters*, 782 F.3d 289, 296 (6th Cir. 2015); *see Rodriguez*, 135 S. Ct. at 1615. Any extension of the stop, however, must be limited in scope and duration. *Winters*, 782 F.3d at 296.

Here, Williamson did not prolong the traffic stop so that Wilson could conduct a canine drug sniff. When Pluto gave a positive alert on Defendants' rental car, Williamson had not yet issued Salazar a written warning, nor had he finished running checks on Defendants' driver's licenses and the Malibu's registration. (Hr'g Tr. at 34–35, ECF No. 44.)

### C. Probable Cause to Search Defendants' Rental Car

Defendants also contend that the canine drug sniff did not provide the troopers with probable cause to search the rental car. (*See* Mot. at 9–10, ECF No. 30; Suppl. Mot. at 6, 10–11, ECF No. 48.) They argue that the Government has provided insufficient evidence that Pluto (i) was properly trained and (ii) alerted on the rental car. These arguments lack merit.

The Fourth Amendment generally requires that police officers obtain a warrant prior to conducting a search. *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007). The United States Supreme Court has long recognized an exception to the warrant requirement with respect to searches of vehicles though. *Id.* Under that exception, police officers may conduct a warrantless search of a vehicle if they have probable cause to believe that the vehicle contains evidence of a crime. *Id.*

"A positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance" if the dog's training and reliability is established. *United States v. Diaz*, 25 F.3d 392, 393–94 (6th Cir. 1994). Determining a drug detection dog's training and reliability is analogous to determining the admissibility of expert evidence, the Sixth Circuit has indicated. *See id.* at 394. The Government has the initial burden of establishing, whether through "testimony from the dog's trainer or records of the dog's training," that the dog is generally certified as a drug detection dog. *Id.* After the Government has made that showing, any other evidence that may detract from the reliability of the dog's performance, including the testimony of other experts or the lack of documentation regarding the dog's training, "properly goes to the 'credibility' of the dog." *Id.* As the Supreme Court has explained:

> If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause. If, in contrast, the defendant has challenged the State's case (by disputing the reliability of the dog overall or a particular alert), then the court should weigh the competing evidence. . . . The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime.

*Florida v. Harris*, 568 U.S. 237, 248 (2013).

### 1. Pluto's Training

Defendants contend that the Government produced insufficient evidence of Pluto's training because the Government has not offered proof that Pluto met the requirements of O.A.C. § 109:2-7-03(C)(2), which mandates that "[d]ocumentation of successful completion of the training program must be provided to the evaluator before the unit is eligible to be tested for certification." This section, Defendants argue, means that "Pluto needed to be 'pre-trained' and

certified, before Trooper Wilson started training with Pluto to obtain final, proper, certification to become a drug detection dog in the State of Ohio." (Suppl. Mot. at 6, ECF No. 48.)

The Court reads § 109:2-7-03(C)(2) differently. Rather than requiring pre-training before the trooper can begin training with the dog, § 109:2-7-03(C)(2) requires "completion of the training program . . . before the unit is *eligible to be tested for certification*." O.A.C. § 109:2-7-03(C)(2) (emphasis added). And contrary to Defendants' suggestion, § 109:2-7-03(C)(2) is not a requirement imposed on the Government for establishing that a drug sniff creates probable cause for a search. *See id.*; *see also State v. Mangan*, 2d Dist. Montgomery No. 23263, 2009-Ohio-6137, ¶ 18 (stating that the Ohio Administrative Code does "not condition the admissibility of evidence obtained as a result of an alert upon compliance with [its] rules" on canine certification).

The Government has not produced documents explicitly stating that Pluto completed an approved canine training program. But neither § 109:2-7-03(C)(2) nor any other authority mandates that the Government do so.

The Government has sufficiently established Pluto's training and reliability without those documents. During the suppression hearing, Wilson testified in detail about Pluto's training. He stated that Pluto completed an initial six weeks of training with Dan Bowman, the owner of Gold Shield K-9 training. (Hr'g Tr. at 122–23, ECF No. 44.) Pluto was then assigned to Wilson; they trained together at Gold Shield for the next six weeks. (*Id.*) Wilson learned, among other things, how to determine whether Pluto has detected narcotic odor and what to do when he has detected it. (*Id.* at 123–24.) After completing their joint training, Wilson and Pluto took the Ohio Peace Officer Training Academy test for canine certification. (*Id.* at 122.) During the one-day test, Wilson and Pluto conducted a building search, an area search, an article search, and a drug

16

search. (*Id.*) Wilson and Pluto first passed the test in 2012. (*Id.* at 125.) They have passed the test, which is now an annual requirement, several more times since then. (*Id.* at 125–26.) And to maintain their skills, Wilson and Pluto train for 16 hours each month. (*Id.* at 126.)

The Government also produced Wilson and Pluto's 2016 certifications, which were valid when Pluto alerted on Defendants' rental car in July 2017. (*See* Hr'g Tr. at 126–27; Certifications at PageID 122–23, ECF No. 32-2.) They certify Wilson and Pluto for heroin detection, among other things. (Certifications at PageID 122–23.)

### 2. The Alert

Defendants also aver that the Government has produced insufficient evidence that Pluto alerted to the presence of narcotics on their rental car. (Suppl. Mot. at 10, ECF No. 48.) The Court rejects this argument.

Both Williamson and Wilson testified that Pluto alerted to the presence of narcotics on Defendants' rental car. (Hr'g Tr. at 33–34, 137–39, 142–43, ECF No. 44.) The Court finds their testimony to be credible.

Defendants dispute Wilson's statement that Pluto turned his body perpendicular to the car as he alerted. (*See* Suppl. Mot. at 10.) Citing footage from Williamson's dash camera video, Defendants suggest that Pluto was merely attempting to sit when Wilson insists that Pluto was situating his body perpendicular to the car. (*See id.*) Defendants also note that Pluto's alert would have been captured on Wilson's dash camera video if he had, in accordance with Ohio State Highway Patrol regulations, turned his camera on prior to conducting the drug sniff. (*Id.*)

But Pluto's angle to the car is not determinative of whether Pluto alerted. As Wilson explained, Pluto alerts by scratching. (Hr'g Tr. at 138.) And in the recording from Williamson's

17

dash camera video, the sound of Pluto scratching the side of the car is unmistakable. (Dash Camera Video at 11:29:14 a.m. to 11:29:24 a.m.)

### III.

The Government has carried its burden of establishing that the troopers had probable cause to stop and search Defendants' rental car. And there is no evidence to suggest that the troopers unlawfully prolonged the traffic stop. Accordingly, Defendants' motions to suppress (ECF Nos. 30, 31, 48) are **DENIED**.

**IT IS SO ORDERED.**

6-25-2018
**DATE**

EDMUND A. SARGUS, JR.
**CHIEF UNITED STATES DISTRICT JUDGE**